## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**NEW MEXICO YOUTH ORGANIZED, a project
of the CENTER FOR CIVIC POLICY, and
SOUTHWEST ORGANIZING PROJECT,**

        Plaintiffs,

vs.                                                     No. CIV 08-1156 JCH/WDS

**MARY HERRERA, in her capacity as
Secretary of State**

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiffs' *Motion for Summary Judgment* [Doc. 16] and *Motion for Preliminary Injunction* [Doc. 17], both filed February 26, 2009. Plaintiffs seek a declaratory judgment that finds unconstitutional, either facially or as applied to them, certain provisions of New Mexico's Campaign Reporting Act, NMSA 1978 §§ 1-19-1 *et seq.* ("NMCRA" or "the Campaign Reporting Act").  Plaintiffs also seek a judgment that Defendant's threat to prosecute or otherwise sanction Plaintiffs for failure to register and report as political committees pursuant to NMCRA violates their First and Fourteenth Amendment rights.  After reviewing the motions, briefs, attachments, and affidavits, and being otherwise fully informed, the Court finds that Defendant has not met its burden to demonstrate the constitutionality of the challenged statute, and therefore finds that Plaintiffs' motion for summary judgment is well taken and will be granted.  Because the grant of summary judgment accords Plaintiffs all of the relief that they seek, their motion for preliminary injunction is denied

as moot.[1]

## BACKGROUND

Plaintiffs in this action are New Mexico Youth Organized ("NMYO") and Southwest Organizing Project ("SWOP"), two nonprofit [501(c)(3)] educational organizations that are avowedly nonpartisan.  In March and April 2008, Plaintiffs mailed out advertisements criticizing several incumbent state legislators for the stances that they took on certain initiatives in the legislative session that had just concluded, pointing out the primary sources of the individual legislators' campaign funding, and urging recipients to contact the legislators to express their concerns about the legislators' votes and funding sources.  The mailings suggested that the legislators were beholden to corporate interests rather than actually working for the public good.  The mailings were targeted to the individual legislators' constituents, and each mailing mentioned an upcoming special legislative session focused on healthcare that was to take place in the summer of 2008.[2]

One of the targeted legislators, Senator Shannon Robinson, sent a letter of complaint to Defendant, and made a telephonic complaint to the New Mexico Attorney General requesting an investigation of Plaintiffs' mailers.  Another targeted legislator, Senator Bernadette Sanchez, also contacted the Attorney General with the same request.  The complaints did not allege that

---

[1] On July 9, 2009, the parties filed a *Joint Motion for Hearing* [Doc. 28].  Because the Court feels that it has sufficient information in the briefing and attachments to enable it to render its decision, and that oral argument of the motions would not materially assist it, that motion is denied.

[2] NMYO's mailers are attached as Exhibit 1 to Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction [Doc. 18], while SWOP's mailers are attached as Exhibit 2.  The mailers targeted five state legislators, all Democrats: Senators Lidio Rainaldi, Shannon Robinson, James Taylor, and Bernadette Sanchez, and Representative Dan Silva.  Senator Rainaldi did not seek re-election in 2008, but the other four legislators did.

the mailings contained inaccurate information, but rather that Plaintiffs were not registered as "political committees" under NMCRA and should have been.  NMCRA requires that organizations "operated primarily" for the purpose of "influencing or attempting to influence an election" must register with the Secretary of State as "political committees," pay a filing fee, and file reports disclosing their activities and contributors.  NMSA 1978 §§ 1-19-26(L), (M); 1-19-26.1(B).

On April 25, 2008, Defendant issued a letter stating that NMYO was not required to register as a political committee under NMCRA.  *See* Defendant's Answer to Complaint [Doc. 5] at ¶ 42.  On May 22, 2008, Albert J. Lama from the Attorney General's Office wrote to Defendant asking her to amend her April 25, 2008 letter "to provide that NMYO should immediately comply with the reporting and other requirements of ...[NMCRA]."  Letter to Mary Herrera from Albert J. Lama, dated May 22, 2008, attached as Exhibit A to Complaint [Doc. 1].  The letter stated that, under NMCRA, a political committee is made up of two or more persons organized to influence an election, and that "[t]he NMYO webpage states that its goal is to train young people to organize voters and support candidates who have a progressive political agenda."  *Id*.  To support that proposition, the letter cites to www.theleague.com.  *Id*.  Rather than belonging to NMYO, however, the cited website actually belongs to the League of Young Voters, a national organization that operates as a 501(c)(4) organization and a political committee.  According to a Declaration by the Executive Director of the parent organization of NMYO, and uncontroverted by any evidence from Defendant, NMYO is, and always has been, an entity separate from the League of Young Voters.  *See* Declaration of Eli Il Yong Lee (hereinafter "Lee Declaration"), attached as Exhibit 3 to Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction [Doc. 18] (hereinafter "P.I. Mem.") at ¶ 4.  In addition to

3

sending his letter to Defendant, Mr. Lama also copied Senator Robinson.

On August 18, 2008, Defendant sent a letter to NMYO stating that "it appears that [NMYO] is operating as a political committee for purposes of [NMCRA]"; that a political committee is required to register and file reports with the Secretary of State's Office; that NMYO had ten days to correct the matter; and that failure to comply with the Campaign Reporting Act would subject NMYO to mandatory penalties and fines as prescribed under NMCRA.  *See* Letter from Mary Herrera to NMYO, dated August 18, 2008, attached as Exhibit B to Complaint [Doc. 1].  Ten days later, Defendant sent a similar letter to Plaintiff SWOP finding that SWOP is operating as a political committee for purposes of the Campaign Reporting Act and demanding that it register as a political committee or face penalties.  *See* Letter from Mary Herrera to SWOP, dated August 28, 2008, attached as Exhibit C to Complaint [Doc. 1].

Although Defendant's letters to Plaintiffs did not attempt to explain the bases for her determination that the two organizations were political committees and therefore subject to registration and disclosure requirements, she has since clarified that her classification of the organizations as political committees is based on the Plaintiffs' mailings sent out in March and April, 2008.  *See* Defendant's Answer to Complaint [Doc. 5] at ¶ 3.

## NEW MEXICO'S CAMPAIGN REPORTING ACT

Of particular relevance to this case is the Campaign Reporting Act's definition of "political committee" and "political purpose," set forth in NMSA §§ 1-19-26(L) and (M) respectively.

> L.  "political committee" means two or more persons, other than
> members of a candidate's immediate family or campaign committee
> or a husband and wife who make a contribution out of a joint

account, who are selected, appointed, chosen, associated, organized or operated primarily for a political purpose; and political committee includes:

> (1) political action committees or similar organizations composed of employees or members of any corporation, labor organization, trade or professional association or any other similar group that raises, collects, expends or contributes money or any other thing of value for a political purpose;

> (2) a single individual who by his actions represents that he is a political committee; and

> (3) a person or an organization of two or more persons that within one calendar year expends funds in excess of five hundred dollars ($500) to conduct an advertising campaign for a political purpose;

NMSA 1978 § 1-19-26(L).  Thus, by default, any organization that spends more than $500 per year on advertising for a "political purpose" is considered to be "operated primarily for a political purpose," regardless of what other activities it engages in, as is any person whose actions make him appear to the Secretary of State to be a political committee.[3]

The Campaign Reporting Act defines "political purpose" as "influencing or attempting to influence an election or pre-primary convention, including a constitutional amendment or other question submitted to the voters."  NMSA 1978 § 1-19-26(M).

NMCRA also includes significant reporting requirements for political committees and penalties for failure to file the required reports:

_____

[3] It is possible that NMSA 1978 § 1-19-26(L)(2) refers to a person that explicitly declares himself to be functioning as a political committee, rather than referring to a person engaging in actions that the Secretary of State deems to qualify him as a political committee.  The statute is unclear on this point, but appears to give the Secretary unfettered discretion and does not appear to put an individual on notice regarding what behavior triggers the registration and reporting requirement..

– Section 1-19-26.1(A) makes it "unlawful for any political committee that receives, contributes or expends in excess of five hundred dollars ($500) in any calendar year to continue to receive or make any contribution or expenditure for a political purpose unless that political committee appoints and maintains a treasurer and registers with the secretary of state."

– Section 1-19-26.1(B) requires that, "within ten days of receiving, contributing or expending in excess of five hundred dollars ($500)" a political committee must pay a filing fee of fifty dollars and file a statement of organization under oath with the Secretary of State.  This statement must contain: a statement of the purpose for which the committee was formed; information about the sponsors of the committee; the name, address, and relationship of any connected association or entity; the names and addresses of the officers of the political committee; and an identification of the bank used by the committee for all expenditures or contributions.

– Sections 1-19-27 and 1-19-29(A), (B), (G), (I), and (J) require that political committees file with the Secretary of State an annual report of expenditures and contributions until the committee is dissolved.

– Section 1-19-31(A) requires political committees to provide in their annual reports: (1) the name and address of the person or entity to whom an expenditure was made or from whom a contribution was received; (2) the occupation or type of business of any person or entity making contributions of two hundred fifty dollars or more in the aggregate per election; (3) the amount or value of the expenditure or contribution; (4) the purpose of the expenditure; and (5) the date the expenditure was made or the contribution was received.

– Sections 1-19-31(B) and (C) require that each annual report provide information on the organization's bank accounts and unpaid debts.

6

– Section 1-19-34.6 requires the Secretary of State to refer the matter to the Attorney General or a district attorney if she reasonably believes that a violation of the Campaign Reporting Act has occurred.  The Attorney General or a district attorney may then seek a civil penalty of fifty dollars for each violation, not to exceed five thousand dollars.

– Section 1-19-36(A) provides that "[a]ny person who knowingly and willingly violates any provision of the Campaign Reporting Act...is guilty of a misdemeanor and shall be punished by a fine of not more than one thousand dollars ($1,000) or by imprisonment for not more than one year or both."

## PLAINTIFFS' ORGANIZATIONS AND MAILINGS

Plaintiff NMYO is a statewide project of the Center for Civic Policy ("CCP"), a 501(c)(3) nonprofit corporation that pays NMYO's operating costs and hires NMYO's staff.  *See* Lee Declaration.[4]  According to the CCP's Executive Director, Eli Lee, "NMYO was formed for

---

[4] In support of their motions for preliminary injunction and summary judgment, both Plaintiffs submitted affidavits from their Executive Directors explaining their organizations' purposes, activities, and budgets. Although she argues that summary judgment is "inappropriate at this stage because there is a material issue of fact as to whether Plaintiffs are organized or operated 'primarily for a political purpose,'" Defendant's Response to Plaintiffs' Motion for Summary Judgment [Doc. 19] at 1, Defendant has offered no evidence to controvert any of Plaintiffs' sworn declarations. Under Fed. R. Civ. P. 56(e)(2), a non-movant cannot avoid summary judgment merely through reliance on allegations or denials, instead, its response "must–by affidavits or otherwise as provided in this rule–set out specific facts showing a genuine issue for trial." She has neither done this nor filed an affidavit with the Court as contemplated by Fed. R. Civ. P. 56(f) to establish that she has a good faith basis to believe that further discovery would provide sufficient evidence to create a fact issue regarding the nature of Plaintiffs' organizations.

Significantly, Defendant has admitted that she classified Plaintiffs' organizations as "political committees" solely on the basis of their March and April 2008 mailings. Whether those mailings are constitutionally susceptible to being regulated and whether a $500 trigger applied to advertising conducted "for a political purpose" can subject an organization to regulation as a political committee regardless of its other activities are both legal questions. There is no dispute that, if the mailings constitute electioneering materials, they subject the Plaintiffs to regulation under NMCRA. The question is whether NMCRA, as applied to

the purpose of educating young New Mexicans about issues such as healthcare, clean elections, the economy, and the environment," and, although NMYO and CCP engage in issue advocacy, they "do not engage in express advocacy for the election or defeat of candidates for public office." *Id*. Mr. Lee also declared that "NMYO engages in educational activities, research, leadership development, and nonpartisan get out the vote...activities," that it "educates the public about how their governmental representatives vote and...are funded," and that it "encourages its constituents to communicate with their representatives regarding issues important to New Mexico youth." *Id*. NMYO sent out nine pieces of direct mail between March 22, 2008 and April 5, 2008, discussing positions taken by certain elected officials during the February 2008 legislative session and the sources of those officials' campaign funding. *Id*. The organization spent approximately $15,000 of its $225,000 annual budget on the direct mail campaign. *Id*.

Plaintiff SWOP is a nonpartisan project of Southwest Community Resources, Inc., a 501(c)(3) nonprofit corporation that serves as SWOP's sponsor for Internal Revenue Service reporting purposes. *See* Declaration of Robert Rodriguez (hereinafter "Rodriguez Declaration"), attached as Exhibit 4 to P.I. Mem. [Doc. 18]. According to its Executive Director, "SWOP was formed for the purpose of empowering and educating the public about issues such as environmental health and justice, economic development, public education, arts and culture, housing, workers' rights, racial justice, and gender equality" and it "engages in educational activities, nonpartisan get out the vote...activities, training and leadership development, and

---

Plaintiffs, is constitutional. In this sense, the Plaintiff organizations' broader reasons for existence are not relevant to this determination, as Defendant has admitted that she did not classify them as political committees for any reason other than the mailings. In granting summary judgment to Plaintiffs, the Court is not saying that there are no circumstances under which Plaintiffs could qualify as political committees, only that the reason advanced by Defendant for her classification is invalid.

community development."  *Id*.  Mr. Rodriguez also declared that "SWOP educates the public about how their governmental representatives vote and...are funded" and that it "encourages its constituents to communicate with their representatives regarding issues important to them," but that it "does not engage in express advocacy for the election or defeat of candidates for public office."  SWOP sent out five pieces of direct mail between March 22, 2008 and April 5, 2008, discussing positions taken by certain elected officials during the February 2008 legislative session and the sources of those officials' campaign funding.  *Id*.  The organization spent approximately $6,000 of its $1,100,000 annual budget on the direct mail campaign.  *Id*.

The mailers sent out by Plaintiffs followed similar patterns in their style and content. Generally, the front of the card posed the question of whether the representative in question worked for constituents or special interests, while the back of the card listed the primary sources of the representative's campaign funding, highlighted the representative's recent votes on several bills, noted that a special session of the legislature focusing on healthcare was upcoming, and urged recipients to call the representative and ask that he represent their interests rather than corporate interests at the upcoming session.

Typical of the mailers sent out by NMYO is one directed to constituents of Senator Shannon Robinson, whose complaint to Defendant and the New Mexico Attorney General led to Plaintiffs being ordered to register as political committees.  The front of the mailing shows a child with a thermometer in her mouth and says "With a special session of the legislature this summer to address HEALTH CARE, it's important to find out WHOSE SIDE IS SENATOR SHANNON ROBINSON ON?"  Ex. 1, attached to P.I. Mem. [Doc. 18] at 13 (emphasis in original).  The back of the mailer asks "When New Mexico's state legislature makes critical decisions on our health care, who will State Senator Shannon Robinson stand with?"  *Id*. at 14.

It highlights a bill that Senator Robinson voted against in the 2008 legislative session (SB474) that "would have required insurance companies to simply disclose to consumers in clear language the reasons why their health insurance premiums are increased each year," and says that by voting against the bill, he "voted with the insurance industry." *Id*. It then cites Senator Robinson's campaign finance reports to contend that, since 2003, almost 70% of Senator Robinson's campaign contributions have come from: the healthcare, pharmaceutical, and insurance industries; lobbyists; banks and the payday loan industry; the liquor and tobacco industries; Political Action Committees; and the oil and mining industries. *Id*. The card concludes by saying "With a special session of the legislature this summer on health care, it's important to CALL SHANNON ROBINSON.  REMIND HIM HE WORKS FOR YOU.  Call Senator Shannon Robinson at []" *Id.* (emphasis in original).

Another variation of the ad highlighted funding sources and several recent votes on bills in favor of the interests of those funding sources and concluded "SENATOR ROBINSON SHOULD WORK FOR YOU...BUT HE DOESN'T.  With a special session of the legislature scheduled for this summer to address the health care crisis, you can bet that the lobbyists and big insurance companies will be calling Shannon Robinson for his help again.  CALL SENATOR ROBINSON AT [].  Ask him to work for the public interest, NOT the special interests, during the Legislative Session." *Id*. at 6 (emphasis in original).  Similar cards targeted other representatives using their voting records and campaign funding sources and urged the recipients to call with respect to the upcoming legislative session.  *See* Ex. 1, attached to P.I. Mem. [Doc. 18] at 1-18.  The mailers that SWOP sent out followed a similar structure, even utilizing some of the same graphics and language as NMYO's mailers.  They simply focused on other legislators. *See* Ex. 2, attached to P.I. Mem. [Doc. 18] at 1-10.

10

## LEGAL STANDARDS

Summary judgment is appropriate if the evidence in the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). As discussed previously, because Defendant has conceded that Plaintiffs' mailings are the only reason they are being classified as political committees, and whether the mailings at issue are regulable electioneering materials that can subject Plaintiffs to regulation as political committees is a question of law, no genuine issues of material fact preclude judgment on the record.

When First Amendment rights are implicated, the government bears the burden of demonstrating the constitutionality of the challenged law. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000). Because the challenged sections of the Campaign Reporting Act concern First Amendment rights, Defendant bears the burden of proving that they are constitutional as applied to Plaintiffs. *See Colorado Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1145 (10th Cir. 2007).

In *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam), the Supreme Court held that mandatory disclosure of political activity imposed by the state must survive "exacting scrutiny." *See also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 337 (1995) (again addressing disclosure requirements, the Court stated: "When a law burdens core political speech, we apply 'exacting scrutiny' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest."). Defendant agrees that the challenged provisions of NMCRA are subject to strict scrutiny. *See* Defendant's Response to Plaintiff's Motion for Preliminary

Injunction [Doc. 20] (hereinafter "P.I. Resp.") at 19.[5]

However, as discussed in more detail below, the *Buckley* Court also held that the government possesses a substantial state interest in regulating political speech only if that political speech is unambiguously campaign related. *See Buckley*, 424 U.S. at 79-81. Thus, before even applying "exacting scrutiny" to determine whether the information required by NMCRA to be disclosed bears a "substantial relation," *id.* at 64, to an overriding state interest, the Court must first determine whether the activities being regulated, in this case, the mailings, are unambiguously campaign related.

<u>"Unambiguously Campaign Related" Materials or "Electioneering Communications"</u>

In enacting the Federal Election Campaign Act ("FECA") in 1971, Congress sought to limit and regulate political contributions and independent expenditures on behalf of candidates for federal office. FECA prohibited individuals from contributing more than $1,000 to any single candidate per election or independently spending more than $1,000 per year "relative to a clearly identified candidate," 18 U.S.C. § 608(b)(1), (e)(1) (1975). In evaluating the constitutionality of FECA, the Supreme Court noted that campaign finance regulations "operate in an area of the most fundamental First Amendment activities." *Buckley,* 424 U.S. at 14. The *Buckley* Court attempted to draw a bright line between election-related activity, which may be regulated, and constitutionally protected political speech, concluding that only those activities that are "unambiguously related to the campaign of a particular...candidate" may constitutionally

---

[5] The parties made the majority of their arguments about the constitutionality of the Campaign Reporting Act in their briefing on Plaintiffs' Motion for Preliminary Injunction, but they incorporated by reference all of these arguments into their briefing on the Motion for Summary Judgment. *See* Plaintiffs' Motion for Summary Judgment and Memorandum in Support [Doc. 16] at 5; Defendant's Response to Plaintiffs' Motion for Summary Judgment [Doc. 19] at 2.

be subject to regulation.  *Id.* 424 U.S. at 80.

In order to enable it to pass constitutional muster, the *Buckley* Court narrowly interpreted the $1,000 limitation on independent expenditures "relative to a clearly identified candidate" as found in 18 U.S.C. § 608(e)(1) "to apply only to expenditures for communications that in express terms advocate" for a specific candidate's election or defeat.  *Id.* at 44.  It found that the narrow interpretation was necessary because the "use of so indefinite a phrase as 'relative to' a candidate fails to clearly mark the boundary" between regulable and non-regulable speech, *id.* at 41, and that in order to avoid invalidation on vagueness grounds, the regulation limiting independent expenditures to $1,000 could apply only to "communications containing express words of advocacy such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44 n. 52.

The *Buckley* Court followed this same logic in addressing the constitutionality of the FECA provision that imposed disclosure requirements on anyone making political contributions or expenditures in excess of $100 per year, as mandated by 2 U.S.C. § 434(e) (1975).  FECA defined "contributions" and "expenditures" as donations of money or other assets "for the purpose of...influencing" the nomination or election of a candidate for federal office.  *Id.* § 431(e), (f) (1975).  The Court determined that it had to narrowly construe this provision as well in order to salvage its constitutionality, finding the phrase "for the purpose of... influencing" the nomination or election of a candidate to be unconstitutionally vague standing alone, because it had the potential to encompass issue discussion as well as advocacy of a political result.[6]  *See*

_____

[6] Note that NMCRA uses similar language to define "political purpose."  *See* NMSA 1-19-26(M) (defining "political purpose" as "influencing or attempting to influence an election or pre-primary convention...").

424 U.S. at 77-79.  In order to preserve the measure's constitutionality, the Court interpreted "contribution" and "expenditure" such that they could only apply to those activities that are "unambiguously related to the campaign of a particular...candidate."  *Id*. at 80.

Thus, the Court limited regulable "contributions" to those donations made directly to a candidate or a campaign committee, those contributions made to other organizations that are specifically earmarked for political purposes, and expenditures made in cooperation with a candidate.  It interpreted "expenditures" even more narrowly, limiting regulable expenditures to those "used for communications that expressly advocate the election or defeat of a clearly identified candidate," precisely as it limited the term when interpreting the $1,000 limitation on independent expenditures.  *Id*.  The decision also included in the category of regulable expenditures all expenditures by "political committees," whether or not used for communications that expressly advocated the election or defeat of a candidate.  *Id*. at 79.  The Court reasoned expenditures by political committees are, by definition, campaign related, but only as long as "political committee" is construed to encompass no organizations other than those "that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate."  *Id*.  It explicitly found that defining "political committee" with reference only to the amount of annual contributions received or expenditures made by the organization created vagueness problems.  *Id*.

In this way, *Buckley* created a bright line rule concerning which contributions and expenditures may be regulated and subject to disclosure requirements if they are not made directly by a candidate or "political committee" as that term is narrowly construed.  Simply put, only those contributions made directly to a campaign or in coordination with a campaign or those independent expenditures "for communications that expressly advocate the election or

defeat of a clearly identified candidate" are subject to regulation.  *Id*. at 80.  Anything else is not "unambiguously related to the campaign of a particular...candidate" and is thus considered constitutionally protected political speech rather than regulable election-related activity.

In the years following *Buckley*, individuals and entities attempted to exploit its holding that only advertisements using words of express advocacy could constitutionally be regulated. Instead of running an advertisement directly urging viewers to vote for or against a particular candidate, people or organizations would instead run an "issue ad," such as one that praised or condemned a candidate's record on a specific issue.  By avoiding the use of the magic words of express advocacy, the entities running the ads also avoided the contribution limits and disclosure requirements of FECA, while still potentially influencing the outcome of the election.  Partly in an effort to close this loophole, Congress enacted the Bi-Partisan Campaign Reform Act ("BCRA") in 2002.  *See McConnell v. Fed. Election Comm'n.*, 540 U.S. 93, 133 (2003).

This legislation expanded the definition of express advocacy to include any "electioneering communication."  2 U.S.C. § 434(f)(1).  BCRA defines an "electioneering communication" as any broadcast, cable, or satellite communication that (1) refers to a clearly identified candidate for public office; (2) is made within 60 days prior to a general election or 30 days prior to a primary election for the office sought by the candidate; and (3) is targeted to the relevant electorate.  2 U.S.C. § 434(f)(3)(A)(i).  Under BCRA, electioneering communications are subject to disclosure requirements.  *See* 2 U.S.C. § 434(f).[7]  The *McConnell* plaintiffs challenged the constitutionality of the provision regulating all electioneering communications.

---

[7] Unlike NMCRA, the BCRA regulations mandated disclosure only of information related to the electioneering communication itself, not disclosure of all contributions and expenditures by the group that made the expenditure for the electioneering communication. Thus, NMCRA casts a much wider net and presents a much greater burden than BCRA.

The *McConnell* Court upheld the regulations, finding that advertisements broadcast in the period just before an election that clearly identify a candidate and advocate his election or defeat were the "functional equivalent of express advocacy," and, as such, were regulable because they fit within *Buckley*'s "unambiguously campaign related" standard.  *McConnell*, 540 U.S. at 206, 281.

Not long after *McConnell*, the Supreme Court revisited the issue, clarifying and narrowing its approval of BCRA's regulation of electioneering communications.  *See Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 127 S. Ct. 2652 (2007) ("WRTL").  The plaintiff, a nonprofit ideological advocacy group, began running a series of ads in July 2004 urging listeners to "contact [Wisconsin] Senators Feingold and Kohl and tell them to oppose" filibusters of judicial nominees in the U.S. Senate.  *WRTL*, 551 U.S. at 2660.  Although the organization wanted to continue running the ads throughout August 2004, it recognized that, as of August 15, thirty days prior to the Wisconsin primary in which Senator Feingold was running unopposed, the ads would undeniably constitute illegal electioneering communications under BCRA.  *Id*. at 2261.  It therefore sued for declaratory judgment, asserting that its ads were true issue ads and therefore non-regulable under the First Amendment, and that BCRA's regulations were unconstitutional as applied to the ads.  *Id*.

The *WRTL* Court agreed that the ads fell within BCRA's definition of "electioneering communication" because they identified candidates by name and were set to run 30 days prior to the primary election.  The question the Court then had to confront was whether these particular electioneering communications were the "functional equivalent of express advocacy," so that they could be constitutionally regulated under the *McConnell* decision.  *Id*. at 2665.  In order to address this question, the Court developed an objective standard that it felt would "reflec[t] our

16

'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* (quoting *Buckley*, 424 U.S. at 14).  It held that "an ad is the equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Id*. at 2667.  It also held that, in analyzing whether the communication is the functional equivalent of express advocacy, the speaker's intent must not be considered.  Rather, the analysis "must be objective, focusing on the substance of the communication rather than the amorphous considerations of intent and effect." *Id*. at 2666.

Applying this test, the Supreme Court held that WRTL's ads were issue ads rather than the functional equivalent of express advocacy.  *Id*. at 2667.  Although the ads named and criticized officeholders less than 30 days prior to an election, and although they were undeniably subject to regulation under BCRA, the Court held that the ads could not constitutionally be regulated under campaign finance laws because they did not expressly advocate for the election or defeat of a candidate, nor were they "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."[8] *Id*.  Instead, the Court found that the ads constituted issue ads, and that "[i]ssue advocacy conveys information and educates," so that "[a]n issue ad's impact on an election, if it exists at all, will come only after the voters hear the information and choose–uninvited by the ad–to factor it into their voting decisions." *Id*. Although the issues discussed in the ads may be important to voters and may push them towards or away from a candidate, "[d]iscussion of issues cannot be suppressed simply because the issues

---

[8] In making this finding, the *WRTL* Court explicitly rejected the argument that any ad that includes an appeal to contact an elected representative is automatically the "functional equivalent" of an ad urging the defeat or election of that representative.

may also be pertinent in an election." *Id.* at 2669.  Ultimately, the *WRTL* Court emphasized that

the test to determine whether an ad is "susceptible of *no reasonable interpretation* other than as

an appeal to vote for or against a specific candidate" is not even triggered unless the ad meets the

brightline rules, including the 30 and 60-day timing rules, of BRCA's definition of

"electioneering communication." *Id.* at 2669 n.7. (emphasis in original).  The *WRTL* Court also

stressed that "in a debatable case, the tie is resolved in favor of protecting speech." *Id.*

Definition of "Political Committee"

The test for whether materials are "electioneering communications" is much simpler

when sent out by a "political committee."  The *Buckley* Court held that expenditures by

candidates and "political committees" are, by definition, campaign-related, and are therefore

regulable.  *Buckley*, 424 U.S. at 79.  However, in making this pronouncement, the Court was

careful to strictly limit the definition of what could constitute a "political committee," narrowing

it significantly from FECA's definition.  *Buckley* found that the general requirement that

"political committees" must disclose all of their expenditures raised vagueness problems similar

to the provision that defined "contribution" or "expenditure" as donations of money or other

assets "for the purpose of...influencing" the nomination or election of a candidate.  *Id.*  The

Court found that, because "political committee" was defined only in terms of the amount of

contributions to or expenditures by an organization in a year, it "could be interpreted to reach

groups engaged purely in issue discussion." *Id.*  Thus, in order to make the disclosure

requirements imposed on "political committees" constitutional, the Court held that the term

"political committee" may "only encompass organizations that are under the control of a

candidate or the major purpose of which is the nomination or election of a candidate."

In *Colorado Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137 (10th Cir. 2007)

18

("*CRLC*"), the Tenth Circuit addressed a challenge to a Colorado law that imposed disclosure requirements on "political committees" and that defined "political committee" by reference to annual expenditures.  *CRLC* held that disclosure laws cannot reach an organization unless the organization meets *Buckley*'s "major purpose" test.  *See CRLC*, 498 F.3d at 1153 ("There is little question that *Buckley*'s 'major purpose test' is left unaltered in the wake of *McConnell*.").  In doing so, it explicitly rejected the argument of Colorado's Secretary of State that it is the 'major purpose' of an expenditure rather than the 'major purpose' of the organization sought to be regulated that is constitutionally significant.  *Id.*

The *CRLC* court embraced a methodology suggested by the Supreme Court to determine an organization's major purpose: (1) examining the organization's central organizational purpose; or (2) comparing the organization's independent electioneering spending with its overall spending to determine whether the preponderance of expenditures is for express advocacy or contributions to candidates.  498 F.3d at 1152 (citing *FEC v. Mass. Citizens for Life*, 479 U.S. 238, 252, 262 (1986) (plurality opinion) ("MCFL").  The *MCFL* Court found that the plaintiff in that case, a nonprofit ideological corporation, could not be classified as a "political committee" or be subject to onerous disclosure regulations because it did not meet *Buckley*'s "major purpose" test as "[i]ts central organizational purpose is issue advocacy, although it occasionally engages in activities on behalf of political candidates."  479 U.S. at 252 n.6.  The *MCFL* Court noted that the plaintiff could later be classified as a political committee "should [the plaintiff's] independent spending become so extensive that the organization's major purpose may be regarded as campaign activity."  *Id.* at 262.

The law at issue in *CRLC* defined a "political committee" as any group that spends more than $200 in a year to support or oppose the nomination or election of one or more candidates,

and it subjected such groups to various administrative, organizational, and reporting

requirements.  *See CRLC*, 498 F.3d at 1153.  In striking down that provision, the Tenth Circuit

held that Colorado's $200 trigger could not serve as a proxy for the "major purpose" test and that

the section was unconstitutional, as applied to the plaintiff organization.  *Id.* at 1154.  In doing

so, it adopted the reasoning of the district court, which found that "the amount of money an

organization must accept or spend –$200–is not substantial and would, as a matter of common

sense, operate to encompass a variety of entities based on an expenditure that is insubstantial to

their overall budgets."  *Id*. (quoting *Colo. Right to Life Comm. v. Davidson*, 395 F. Supp. 2d

1001, 1021 (2005)).  It further noted disapprovingly that, under [the Colorado law defining

"political committee"], "an entity that spends $200,000 on various non-political activities and

donates $200 (1/10 of 1% of its budget) to a candidate is deemed a political committee."  *Id*.

(quoting 395 F. Supp. 2d at 1021).

## ANALYSIS

A.  Standing

Defendant contends that Plaintiffs cannot establish that the reporting and disclosure

requirements imposed on them by the Campaign Reporting Act significantly burden their

speech.  *See* P.I. Resp. [Doc. 20] at 22.  However, the Supreme Court has "repeatedly found that

compelled disclosure, in itself, can seriously infringe on privacy of association and belief

guaranteed by the First Amendment."  *Buckley*, 424 U.S. at 64.  The *MCFL* Court echoed this

sentiment, finding that the registration, recordkeeping, organizational, and disclosure

requirements associated with being classified as a political committee "may create a disincentive

for such organizations to engage in political speech."  479 U.S. at 254 (*quoted in CRLC*, 498

F.3d at 1152).  The *MCFL* Court further found that "while [the statute regulating political

20

committees] does not remove all opportunities for independent spending by such organizations as MCFL, the avenue it leaves open is more burdensome than the one it forecloses.  The fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize [the statute] as an infringement on First Amendment activities."  479 U.S. at 255.

Defendant also contends that Plaintiffs have no standing to sue unless they are, in fact, required by the Campaign Reporting Act to make the disclosures of which they complain and, because Plaintiffs dispute that the Act applies to them, they cannot show that they have been harmed.  *See* P.I. Resp. [Doc. 20] at 4.  This argument fails.  Plaintiffs have demonstrated their standing to challenge the referenced NMCRA provisions.  They were classified by the Secretary of State as political committees, even after providing arguments and evidence in letters to the State that they are not.  Defendant's letters to Plaintiffs threaten them with penalties if they fail to register as political committees and to follow the associated mandatory reporting requirements.  In addition to the civil penalties threatened in the letters to Plaintiffs, NMCRA also contains a criminal penalty for willful violation of any provision of the Campaign Reporting Act.  *See* NMSA § 1-19-36(A).  As the Tenth Circuit found in *CRLC*, because the Secretary of State has unequivocally indicated that Plaintiffs are subject to penalties if they fail to register as political committees, Plaintiffs have "suffered the constitutionally sufficient injury of self-censorship through the chilling of protected First Amendment activity, rendering its as-applied challenge to [the Campaign Reporting Act] justiciable."  *CRLC* at 1145 (emphasis in original).

Defendant also argues that this litigation is not the proper forum to determine whether Plaintiffs' actions are covered by the statute, because the Act sets forth an administrative procedure under which a party may ask the Secretary of State to change her decision and, if that fails, may submit to binding arbitration to determine if an assessed penalty will be upheld.  *See*

21

NMSA § 1-19-34.4.  Plaintiffs' freedom of expression has already been chilled.  In addition, although Plaintiff SWOP submitted a letter to Defendant outlining its legal reasoning for why it cannot be required to register as a political committee, that appeal did not get Defendant to change her position.[9]  A statute's constitutional infirmities cannot be cured merely by setting up multiple administrative layers for potential speakers to go through before they know if their speech is approved.  "Simply put, the ability to engage in political speech cannot be made into a matter of repetitive supplication."  *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 299 (4th Cir. 2008).

    B.  Were Mailings "Electioneering Communications?"

    An independent political communication cannot be considered campaign-related, and, therefore, cannot constitutionally be subject to regulation, unless either: (a) it uses express words of advocacy such as "vote for" or "defeat"; or (b) it "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *WRTL*, 127 S. Ct. 2669 n.7.  Under this test, Plaintiffs' mailings cannot constitutionally be regulated and, therefore, cannot legitimately form the basis for Defendant's order that Plaintiffs register as political committees.

    Defendant concedes that the mailers "did not expressly urge the recipients to vote against any of the targeted legislators."  P.I. Resp. [Doc. 20] at 1.  Instead, she argues that the mailers are regulable because they were sent for a "political purpose," defined in NMCRA as "influencing or attempting to influence an election or pre-primary convention...."  *Id*. at 4-5

---

[9] By mentioning Plaintiff SWOPs' submission of a letter to the Secretary of State appealing her decision prior to filing this lawsuit, the Court in no way intends to suggest that such an appeal is a prerequisite to a constitutional challenge.

(citing NMSA § 1-19-26(M)).  She also argues that, because the mailers were sent out "within sixty or ninety days" before primary elections and failed to focus on any single issue, they were not "classic issue advocacy," but instead had an "electioneering nature."  *Id*. at 5.

As an initial matter, NMCRA's definition of "political purpose," making campaign finance laws applicable to groups that use resources for the purpose of "influencing or attempting to influence an election," mirrors the definition of "political purpose" already found unconstitutionally vague and overbroad in *Buckley*.  The *Buckley* Court found that the provisions in FECA that regulated contributions or expenditures made "for the purpose of...influencing" the nomination or election of candidates was inherently ambiguous and "poses constitutional problems."  424 U.S. at 77.  It considered the phrase unconstitutionally vague because it failed to give fair notice to people that might be charged under the Act's criminal provisions for making a prohibited contribution or expenditure or failing to make a required disclosure, and it considered the phrase to be overbroad, because it could "encompass[] both issue discussion and advocacy of a political result."  *Id*. at 78-79.  In order to salvage the challenged portion of FECA, the *Buckely* Court construed expenditures made "for the purpose of...influencing" an election "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate," because that "reading is directed precisely to that spending that is unambiguously related to the campaign of a particular...candidate."  *Id*. at 80.  Similarly, this Court finds that the phrase "political purpose," defined in NMSA § 1-19-26(M) as "influencing or attempting to influence an election..." may constitutionally apply to reach only those contributions or expenditures that are unambiguously campaign-related in that they are used for communications that constitute express advocacy for the election or defeat of a clearly identified candidate, or its "functional equivalent" as defined in *WRTL*, 127 S. Ct. at 2667.

Under that narrowed construction, the Campaign Reporting Act cannot constitutionally reach the mailings sent out by Plaintiffs, because those ads are susceptible of a "reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *WRTL*, 127 S. Ct. at 2667, 2669 n.7.  The ads did not mention any future primary or general election in which the targeted legislators would be running.[10]  Instead, the ads all referenced an upcoming special session of the legislature that was focused on healthcare.  The ads cited positions taken by the legislators in the just-ended session that indicated, in the eyes of Plaintiffs, a proclivity to side with corporate interests over the interests of individual constituents.  The ads further highlighted sources of the legislators' campaign funding in an effort to tie the alleged proclivity to vote on behalf of corporate interests to the sources of their funding.[11]  Finally, the ads warn that corporate interests are likely to try to influence the legislators' positions on health care legislation at the upcoming special session, and urge recipients to contact their legislator so that their voices, in addition to those of special interests, may be heard.  Rather than being unambiguously campaign-related and the functional equivalent of express advocacy for the defeat of a particular candidate, the ads identify an issue, give the recipients information related to that issue, and urge them to contact their legislator with respect to that issue.  This is precisely the type of political expression that is constitutionally protected as addressed by *Buckley* and its progeny.  Even though the ads could be seen as attacking the targeted legislators in addition to

---

[10] Indeed, one of the legislators that was the subject of the ad campaign, Senator Lidio Rainaldi, did not even run in the next primary election.

[11] *Buckley* recognized that providing the electorate with information regarding sources of campaign funding alerts voters "to the interests to which a candidate is most likely to be responsive and thus facilitate[s] predictions of future performance in office."  424 U.S. at 66-67. This information can be equally valuable to constituents in evaluating positions once a legislator is in office.

raising awareness about the upcoming special session, "where the First Amendment is implicated, the tie goes to the speaker, not the censor." *WRTL*, 127 S. Ct. at 2669.

Plaintiffs argue that, because the mailings that subjected them to regulation under NMCRA were not mailed within 30 days of a primary election or 60 days of a general election, they cannot constitutionally be considered "electioneering communications," and cannot be subject to disclosure requirements. BRCA, the federal campaign finance statute, clearly limits regulable "electioneering communications" to those messages sent within the 30/60 day period prior to a primary/general election. NMCRA, in contrast, contains no requirement of proximity to an election. The *WRTL* Court emphasized that the "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate" test is not even triggered unless the speech meets the brightline requirements of BRCA, including the requirement of its proximity to an election. 127 S. Ct. at 2669 n.7. At least two other courts have recently held that the 30/60 day limitation is constitutionally required. *See N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 283 (4th Cir. 2008)(striking down portions of a North Carolina campaign financing law as unconstitutional in part because of the law's failure to limit the definition of electioneering communications to the 30/60 day period prior to an election); *Nat'l Right To Work Legal Def. and Educ. Found. v. Herbert*, 581 F. Supp. 2d 1132, 1150 (D. Utah 2008)(same).

Because the *WRTL* Court was interpreting the constitutionality of BCRA rather than setting out a blanket rule regarding what can constitute an "electioneering communication," and because this circuit has yet to rule on the matter, the Court is not inclined to find that the 30/60 day period before an election is the absolute outside window for constitutionally regulating campaign-related materials. However, the fact that the communications in question were made

25

well outside of this period further informs the Court's findings that the ads were not regulable "electioneering communications" as claimed by Defendant.

    C.  <u>Can Plaintiffs be Classified as "Political Committees?"</u>

    Even if the mailings could be regulated as electioneering communications, the mailings alone are not sufficient to subject Plaintiff organizations to NMCRA's registration and reporting requirements as political committees.  The Supreme Court has repeatedly held that only organizations controlled by a candidate for office or organizations whose "major purpose" is the election or defeat of a candidate can be required to register and report as a political committee. *Buckley*, 424 U.S. at 79.  Subsequent case law has reaffirmed this holding.  *See MCFL*, 479 U.S. at 262; *McConnell*, 540 U.S. at 170 n.64.  NMCRA's definition of "political committee" initially says that such an organization must be "operated primarily for a political purpose,"[12] but it then expands the definition to include, by default, any organization that spends over $500 in one year on a political ad campaign.  NMSA § 1-19-26(L).

    Although the use of "primarily for a political purpose" tracks *Buckley*'s "major purpose" language, the statute completely subverts that test by classifying an electioneering expenditure greater than $500 as irrefutably constituting the organization's primary purpose, regardless of what percentage of operating funds the expenditure constituted or what else the organization spent its resources on.  By defining spending over $500 on an election-related ad as sufficient to subject an organization to the full panoply of regulations otherwise reserved solely for

---

    [12] As previously discussed, in order to avoid problems of unconstitutional vagueness and overbreadth, the Court will narrow NMCRA's definition of "political purpose" to reach only those contributions or expenditures that are used for communications that constitute express advocacy for the election or defeat of a clearly identified candidate, or its "functional equivalent," rather than following its statutory definition of "influencing or attempting to influence an election...."

organizations whose primary purpose is to advocate for or against candidates, the statute renders the "major purpose" test completely superfluous.

The Tenth Circuit recently found Colorado's campaign finance statute unconstitutional to the extent that it defined "political committee" on the basis of expenditures rather than "major purpose." *CRLC* at 1139. Although, on its face, NMCRA purports to apply only to those organizations operated "primarily for a political purpose," the constitutional infirmities identified in *CRLC* apply to the Campaign Reporting Act as well. *CRLC* held that defining an organization as a "political committee" solely on the basis of an insubstantial spending trigger "is incompatible with a 'major purpose' test" in part because it could ensnare entities whose expenditures are insignificant in relation to their overall budgets. 498 F.3d at 1153-54.[13]

NMYO's yearly budget is approximately $225,000. SWOP's yearly budget is approximately $1,100,000. Thus, under NMCRA, these organizations would be classified as "political committees" if they spent as little as 2/10 of one percent and 5/100 of one percent of their budgets, respectively, on electioneering communications. Taking it out of the realm of the hypothetical, in this case, NMYO spent approximately $15,000 on the mailings, which amounts to less than seven percent of its budget, and SWOP spent approximately $6,000 on the mailings, which amounts to just over 1/2 of one percent of its budget. Such proportionally small expenditures, standing alone, cannot justify characterizing an organization's "major purpose" as electioneering. A statute that subjects organizations to the burdens of registering as political committees based solely on such insubstantial expenditures is not narrowly tailored and cannot

---

[13] Defendant maintains that, to the extent *CRLC* can be read to prohibit a state law requiring financial and other disclosures from an organization that only occasionally engages in electioneering activity, it is wrongly decided and this Court is not bound to follow it. P.I. Resp. at 18. The Court declines the Secretary of State's invitation to ignore Circuit precedent.

survive exacting scrutiny.

Defendant correctly notes that *Buckley* permits the application of disclosure requirements to organizations other than those existing primarily to advocate for the election or defeat of a particular candidate, P.I. Resp. [Doc. 20] at 6. However, it is important to recognize the essential distinction between laws that require disclosure only of campaign-related contributions and expenditures and those, such as the statute at issue in this case, that require disclosure of every organizational contribution and expenditure. Defendant's argument appears to conflate the two types of laws. Simply put, the state has the authority to regulate contributions and expenditures supporting express advocacy or its functional equivalent, but the state is without the authority to compel an organization to register as a political committee on the basis of such expenditures alone if the organization's major purpose is not the nomination or election of a candidate. Because NMCRA targets organizations as a whole, requiring a reporting of each expenditure and source of each contribution received by the "political committee," without regard to whether the expenditure was for an election-related expense, or whether the contribution was made specifically for such a purpose, it differs in a material respect from valid laws governing regulation of only election-related transactions. Defendant's discussion of rulings concerning laws that are significantly narrower than NMCRA thus misses the mark.

For instance, Defendant cites *FEC v. Mass. Citizens for Life*, 479 U.S. 238, 248 (1986)("MCFL") for the proposition that expenditure reporting requirements may constitutionally be applied to organizations whose major purpose is not the election or defeat of a candidate. *See* P.I. Resp. [Doc. 20] at 11-12. While an accurate summary of the case law, this does nothing to demonstrate the constitutionality of the challenged statute. In *MCFL*, the Court found that FECA's guidelines governing disclosure of independent expenditures made on behalf

of candidates by organizations whose major purpose is not campaign advocacy was sufficient to protect the state's interest, and that the state could not impose more rigorous guidelines.  The existing statute required organizations whose major purpose is not campaign advocacy but who occasionally make independent expenditures on behalf of candidates to: (1) identify all contributors who donate in a given year more than $200 in funds *intended to influence elections*; (2) specify all recipients of independent expenditures on campaign-related materials of over $200; and (3) identify all persons making contributions over $200 "earmarked for the purpose of furthering [such] independent expenditures."  479 U.S. at 252.  The Court rejected the more stringent rules that the F.E.C. sought to impose, finding that "[t]hese reporting obligations provide precisely the information necessary to monitor MCFL's independent spending activity and its receipt of contributions."  *Id*. at 262.  Significant to this case, the Court held that "[t]he state interest in disclosure can therefore be met in a manner less restrictive than imposing the full panoply of regulations that accompany status as a political committee under the Act."  *Id*.

NMCRA contains no middle ground that incorporates disclosure requirements governing only electioneering communications, such as those discussed in MCFL.  Instead, by requiring those organizations that make even minor expenditures on electioneering communications to register as political committees, the Campaign Reporting Act, as applied to Plaintiffs, impermissibly "regulate[s] a relatively large amount of constitutionally protected speech unrelated to elections merely to regulate a relatively small amount of election-related speech."  *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 289 (4th Cir. 2008).

## CONCLUSION

Narrowly drawn disclosure requirements capturing campaign-related spending are unquestionably constitutional, and have even been recognized as a valuable tool in deterring

corruption in the election process. *See Buckley*, 424 U.S. at 60.  Disclosure provides the

electorate with information necessary to make educated decisions after an open debate. *See*

*McConnell*, 540 U.S. at 196.  However, because the First Amendment "guarantee has its fullest

and most urgent application precisely to the conduct of campaigns for political office," *Buckley*,

424 U.S. at 15, disclosure requirements are strictly regulated.  The NMCRA disclosure

regulations, as applied to Plaintiffs, fall outside the guidelines set forth by the Supreme Court

and Tenth Circuit.

     **IT IS THEREFORE ORDERED** that Plaintiffs' *Motion for Summary Judgment* [Doc.

16] is GRANTED and Plaintiffs' *Motion for Preliminary Injunction* [Doc. 17] is dismissed as

moot.

                                    _____

                                    JUDITH C. HERRERA

                                    UNITED STATES DISTRICT JUDGE